# Ott *versus* Oyer's Executrix.

1. The credit of a witness may be so shaken that the jury would not rely upon his testimony alone to establish a fact, and yet might justly consider it with other testimony. The degree of weight to be given the testimony of each witness, is for the jury, not for the court.

2. To overthrow a written contract by parol evidence, it is necessary that such evidence be clear, precise and satisfactory; but this does not mean that it must lead to a certain conclusion. It is enough if there be evidence to satisfy an unprejudiced mind beyond reasonable doubt.

3. In an action upon a promissory note there was testimony which might warrant a finding that the note was given for a special and innocent purpose, either to be returned to the maker or the true amount to be

fixed by a future settlement. The court charged as follows: "If that fact, standing by itself, was proved to your entire satisfaction, that the note was given under those circumstances and was to be returned again, . . . . . then I say to you that the plaintiff would have no right to use the note as evidence of indebtedness against the defendant. But the burden is upon the defendant. He must satisfy you by the weight of evidence, by testimony in which you have implicit confidence."

*Held*, that this was equivalent to an instruction that there must be no doubt resting on the minds of the jury respecting the testimony they were to consider; and was, therefore, error.

4. The parties to said note, which was for $1,800, were tenants in common of a certain farm, which they had an opportunity to sell. Pending negotiations for a sale, and five years after the making of the note, they entered into a written agreement to consider the note as for $300, if the sale was accomplished; otherwise the note, which had been put into the hands of a third party, was to be returned to the payee. In the above action on this note the court further instructed the jury, that the making of said agreement by the parties to the note, and the absence of any testimony that the maker then demanded that the note be returned to him, was a significant circumstance as bearing on the credibility of a witness who had testified that the payee of the note, five years before, had acknowledged that it was made under the circumstances referred to in paragraph 3 (supra).

*Held*, to be error.

5. Another instruction of the court began, "If, then, you are satisfied from the testimony of Philips and Ott that," &c.; and although what followed was proper:

*Held*, that the instruction was erroneous as excluding from the jury the consideration of the material testimony of another witness, which was entitled to credit if they believed him.

6. The defendant in this suit, under his plea of payment, claimed to set off certain payments made by him for the plaintiff. The court charged that all such payments made by defendant more than six years prior to filing his plea, unless acknowledged subsequently, were barred by the statute of limitations, and added: "According to the testimony, as I recollect it, there are but two items where the money was paid within six years, viz." Afterwards the court refused to allow the defendant to send out with the jury a statement containing any items of payment except those two; giving as a reason, in the presence of the jury, that all others were barred by the statute of limitations.

*Held*, that the said instruction and subsequent action of the court, taken together, practically forbade the jury to allow any set-off except the two items mentioned, and, there being evidence tending to show that there were other payments within six years, was error.

7. In the absence of a request for a specific instruction, the judgment of the court below will not be reversed for what was left unsaid to the jury, if what was said was not misleading.

8. The court below refused to allow the defendant to send out with the jury a statement of certain payments, and a docket showing the satisfaction of certain judgments, for the purpose of establishing a set-off:

*Semble*, that a failure to print, in the paper book, the statement and the particular judgments referred to, was sufficient ground for a refusal by the Supreme Court to sustain an assignment of error based on said action of the court below.

March 13, 1884.  Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.

ERROR to the Court of Common Pleas of *Northampton county :*  Of July Term, 1883, No. 147.

Assumpsit, by Sarah Oyer, executrix of John J. Oyer, deceased, against William Ott, upon a promissory note given by the defendant to John J. Oyer.

The defendant pleaded non-assumpsit, payment with leave, &c.; under which pleas he set up a counter claim, and also defended on the ground that the note was given under the following circumstances:  John J. Oyer and William Ott together bought a certain farm, which they held as tenants in common, paying therefor $4,000 in cash, and securing the balance of $3,650 by judgments, payable at the rate of $500 per annum.  The former had two children, Daniel Oyer and Harriet, wife of the said William Ott.  After the purchase of the farm Ott and J. J. Oyer occupied it together.  They never had any settlement, but in 1873, as alleged by the defendant, Daniel Oyer, the son, who was suffering from some mental disorder, became much excited over the fact that there had been no settlement between his father and Ott; and in order to satisfy Daniel, J. J. Oyer and Ott had a pretended settlement, at which the note in suit, for $1,800, was given by the latter to the former, as representing a fictitious balance, under the agreement that the note should be returned as soon as Daniel went home, and a settlement had at some future time.

The note was never returned, and in 1878 an opportunity occurred to sell the farm to one William Boyer, at an advanced price.  Pending the negotiations, Ott and J. J. Oyer entered into a written agreement that in order to effect a sale the note should be compromised and taken at $300, in case the sale was consummated.  The sale afterwards fell through, and the note, which had been delivered to one Jesse Pearson to hold during the negotiations, was given back to Oyer.

In February, 1878, J. J. Oyer died, without having collected the note, and his executrix, who denied the execution of the same under the circumstances above set out, and claimed that the note was a bona fide obligation, brought this suit.

At the trial, before MEYERS, P. J., inter alia, the following testimony was introduced:

Theodore Ott, the brother of William Ott, testified:  " Mr. Oyer and myself went out in the kitchen and got talking over it there, and he says:  'Now, if you can get Harriet to sign off, we can sell the property,' and says I:  'There is only one thing that I can see in the way,' says I; 'she is caviling about the note.'  . . . . .  Well, he says:  'The $1,800 note is not

right.   Bill owes me about $300, but we have a settlement to make between us.' "

S. W. Bogardus testified:   " Mr. Oyer came to my house to get something that my stepson had made for him, and I asked him how his son was getting along—that is, Daniel Oyer here. Mr. Ott, prior to that, had been to see me, and told me that he was a little out of his mind, and I asked Mr. John J. Oyer how he was getting along, and he said he was getting better, he thought, and then I made the remark, asking him if he didn't think it was singular he should get such a notion in his mind that Mr. Ott owed him so much money, and his answer was:   'I think somebody has bewitched him.   Mr. Ott don't owe me anything of that kind; the note was simply given to get Mr. Daniel Oyer to go home.   I am going to give it back to Mr. Ott.'   . . . . .   He said that Mr. Ott did not owe him anything."

One John J. Philips, called by the defendant, said:   " Well, afterwards I was there one day·sitting on the porch with Mr. and Mrs. Oyer, talking, when Mr. Ott passed and appeared to be out of humor; did not say anything.   I asked after he had gone what was up with Mr. Ott.   The old lady then spoke and says:   'He is mad about the note that was given some time ago when Daniel was here,' and so the old man spoke and says:   'I am willing to make this note right; the note is not right, but I am willing to make it right.   We fixed this to satisfy Daniel, so there would not be any bad feelings, but I am willing to make the note right.'   That was about all that was spoken then about the note."

Annie Ott, a daughter of William Ott, speaking of J. J. Oyer, testified:   " Grandfather said she (Mrs. Wm. Ott) should take up that note; that he did not want to go to the workhouse on account of that note, and my mother said no one would put him there, and then he said again she should take up that note, and she said she could not."

Richard Wilson, called by the defendant:   " I went to see Mr. Ott; he said that this note he did not think was right.   I asked him about the note, what it was, and he said it had been given in settlement, but it was not right.   I went back then to Mr. John J. Oyer and communicated it to him in regard to that note, saying that it appeared there was a difficulty between them about that note, and Mr. Oyer said that the note was all right.   . . . . .   I asked Mr. Oyer then about the note, and he said the note was given in settlement between Mr. Ott and himself, and the note was right.   I then went back to Mr. Ott again and said to him that Mr. Oyer claimed this note was right, and that he held him for that note, and there seemed to be a great controversy between

them; one claimed the note was right, and the other it was not right."

Reuben Weidman, called for plaintiff, testified: "In 1873, the last of November or the beginning of December, Mr. Ott told me he had given a note to Mr. Oyer of $1,800, but it was not right. He did not owe the $1,800; but he owed $1,400 on the note."

Birge Pearson was asked by plaintiff: "State whether or not you had a conversation, since the death of John J. Oyer, with William Ott about this note? A. Yes.

Q. State whether or not, in that conversation, he told you anything about how much he owed on the note? A. He gave me some particulars at the time, I forget what they were, but he owed a certain amount, he named the amount, but I have forgotten what it was."

The charge of the court was, inter alia, as follows: "If the testimony of S. W. Bogardus is to be believed in this case, and that testimony is, in one particular, entirely different from the testimony of Ott and Philips, for from the testimony of Bogardus it is claimed that John J. Oyer not only made the declaration that this note was wrong, and given under the circumstances I have referred to, but that it was the understanding and agreement at the time when the note was given that it should be returned again, and in that testimony there is no declaration, as alleged to have been made by John J. Oyer to the other witnesses, that anything was due, but, on the contrary, that he should have said that Ott owed him nothing at all, and that the note should be returned.

If that fact, standing by itself, was proved to your entire satisfaction that the note was given under those circumstances, and was to be returned again to William Ott after Daniel Oyer had gone away, then, I say to you, that the plaintiff would have no right to use that note as an evidence of indebtedness against the defendant and enforce its payment against him, because the law would call that a fraud upon the plaintiff in seeking to use the instrument for a purpose different from that for which it was originally made or intended by the parties. (1st assignment of error.) . . . . . Bogardus says that this note was to be returned, and that it was given merely for the purpose of satisfying Daniel Oyer. Neither of the other two witnesses who testify as to declarations made by John J. Oyer, Ott and Philips, say that John J. Oyer said anything that this note should be returned.

[We have the significant fact, and I ask your attention to it especially, that five years afterwards, this note remaining all the time in the hands of John J. Oyer, these parties come together and enter into an agreement concerning the sale of

their land, that in that agreement, and in the conversation about it at the time between John J. Oyer and William Ott, according to the testimony, there is not a single word of testimony that William Ott, either in that agreement in the paper or in the conversation between the parties at the time, made any assertion or claim that this note was to be returned to him, but, on the contrary, he expressly agrees in this paper that if this agreement fell through the note should be returned to John J. Oyer. I say that this is a significant circumstance as bearing upon the credibility of the testimony of S. W. Bogardus.] (2d assignment of error.) . . . . . You are in duty bound to consider every other circumstance in the case, every other item of testimony in the case that has any bearing on it in passing upon the question of his credibility. You have a right to take into consideration the fact that he differs in this respect from the testimony of the other two witnesses, Ott and Philips, in that he undertakes to say that John J. Oyer told him that William Ott owed him nothing, while Philips says that all that Oyer said was that this note was not right, and that he was willing to make the note right—in what way I don't know—but that is the language given, and Ott says that Oyer said that William Ott only owed him at that time $300. Neither of the witnesses say that the note was to be returned to William Ott. (3d assignment of error.)

You will inquire in the first place as to the credibility of the testimony of Bogardus. If that satisfies you that the note was to be returned to Ott then the plaintiff is defeated here.

But the burden is upon the defendant. He must satisfy you by the weight of the evidence and by competent evidence, by testimony in which you have *implicit confidence.* (4th assignment of error). . . . . . If you believe the testimony of Dr. Bogardus, and the weight of the evidence satisfies you that that testimony is with the defendant, then there can be no recovery by the plaintiff. If on the other hand you disbelieve that testimony, you are then referred to the testimony of Ott and Philips to ascertain what the declarations of John J. Oyer were as made to them. (5th assignment of error). . . . . .
If then, gentlemen of the jury, you are satisfied, from the testimony of Philips and Theodore Ott, that when this note was given by William Ott to John J. Oyer, they only put down an amount in round numbers—$1,800, and did so without any calculation and balancing of their accounts, and it was understood between them that this note was afterwards to be corrected and the amount fixed at the correct sum, then your inquiry will be what that amount is, and whatever that corrected amount should be, if there was any correction to be

made, for that amount the plaintiff would be entitled to recover a verdict, together with interest, less any legal set-off which the defendant has established that he is entitled to in this case. (6th assignment of error). . . . . . If these parties were partners, as claimed here, in their farming operations, then I say to you that the law is, that where an action is brought on a promissory note, alleged to have been given by the defendant, William Ott, to the plaintiff's testate John J. Oyer, it is not competent to give in evidence, or to take into consideration any set-off against said note, growing out of their partnership relations. But if they were not partners, and William Ott, in carrying on the farming operations paid the taxes for both or paid any debts contracted by them in respect to said farming, or paid any portion of the purchase money on behalf of John J. Oyer, then, in such case, we say to you, that John J. Oyer became liable for his portion so paid from the moment the payments were made by William Ott. [If such payments, or any of them, were made more than six years prior to April 1879, and the debts thus made were not revived by an acknowledgment on the part of John J. Oyer, consistent with a promise to pay, made within the said six years prior to, then I say to you that all payments made more than six years prior to December 1879 are barred by the statute of limitation. According to the testimony, as I recollect it, there are but two items where the money was paid within six years, viz.: the tax of $16.80 and the Peter Frutchey judgment of $585. If you believe, according to the testimony of Bogardus, that this note was to be returned, then there can be no recovery by the plaintiff, but there may be a certificate in favor of the defendant. If you should reject the testimony of Bogardus, then you will determine the actual amount for which the note should stand as corrected, according to the intentions and declarations of the parties, and the plaintiff would be entitled to a verdict for that amount, with interest on the same from April 1, 1873, up to the date when the payment was made by William Ott upon the judgment held by Frutchey, then deducting one-half of said payment and calculating interest on the balance up to date when tax was paid. Then taking the middle of the year when the tax was paid deduct one-half of such tax, and on the balance calculate interest up to date of verdict]." (8th assignment of error).

The defendant proposed to send out with the jury a statement under his plea of payment, showing the amount as set-off. Objected to by plaintiff "because the undisputed evidence is that all such claims are barred by the statute of limitations, except the one-half of $585 and the one-half of $16.80."

[Ott *v.* Oyer's Executrix.]

BY THE COURT. " The objection is sustained as to the rest." Exception. (9th assignment of error.)

Defendant then proposed to send out the judgment docket of the court showing several payments testified to as given for the purchase money of the property purchased by Oyer & Ott. Objected to. Objection sustained, except that defendant was allowed to send out the last one of $585. Exception. (10th assignment of error.)

Verdict for plaintiff for $1,669.49, and judgment thereon; whereupon the defendant took this writ, assigning for error the charge and rulings of the court as above set out.

*W. S. Kirkpatrick* (with whom were *E. J. Fox & Son*), for the plaintiff in error.—In the first and fourth assignments we complain that the court insisted in its charge upon too strict a measure of proof. Our defence was that the note was without consideration, that there was no settlement between Wm. Ott and John J. Oyer, and no balance was ascertained between them; that the note was not intended to be retained as such, but having served a temporary purpose was to be returned. We were only bound to satisfy the jury of the facts constituting our defence by the weight of evidence. The court said to the jury that we must establish it to their entire satisfaction, and by evidence in which they had implicit confidence. In other words, we were required to demonstrate our defence to a certainty. The expression, entire satisfaction, excludes all doubt, and is even stronger than the proof implied in the phrase, " beyond a reasonable doubt." Even if our defence should be considered as involving the element of fraud, this instruction was too strict: Young *v.* Edwards, 22 P. F. S., 257; Greenleaf on Ev., vol. 1, p. 18, § 13; Hiester *v.* Laird, 1 W. & S., 245. The error complained of in the second and third specifications is that the court misled the jury as to the proper test of the credibility of Dr. Bogardus. The impression conveyed by the court is that Bogardus was contradicted, and the jury were virtually told to consider the testimony of Ott and Phillips as if they had given different versions of the same conversation. The court further assumes that Oyer must always have been consistent with himself in his declarations on this subject on all occasions, and that he could not have made a declaration less favorable to himself on one occasion than another. The error complained of in the fifth and sixth assignments is that the court confined the whole of the defendant's defence to the testimony of Bogardus, and made it dependent upon the jury's belief in his testimony alone. The principal error complained of in the eighth and ninth assignments is that the court gave a peremptory and binding in-

[Ott *v.* Oyer's·Executrix.]

struction that under the plea of payment as a set-off we were confined to but two items, to wit: One-half of the tax of $16.80 and the last Peter Frutchey judgment of $585. This was clear error. Our plea of payment, under which we were entitled to prove our counter-claim, was filed December 17, 1879. We were entitled to have the jury consider all payments of which there was any evidence whatever, made by Ott for Oyer, or moneys of Ott received by Oyer within six years prior to that date. At the conclusion of the charge the defendant proposed to send out with the jury the record of the judgments given for the purchase money of the property bought by Oyer and Ott, and paid by the latter. The court, in the presence of the jury, refused to allow the judgments to go to the jury, except the last one, which was the one for $585. The court thus excluded from the jury material evidence, going to show the real state of the indebtedness between Oyer and Ott at the time of giving the note.

*Henry W. Scott* for the defendant in error.—In considering the charge of the court the whole of it must be taken together: Blair Iron & Coal Co. *v.* Lloyd, 3 W. N. C., 103; Bitner *v.* Bitner, 15 P. F. S., 347. In that part of the charge embraced in the fourth assignment, upon the same subject and to the same witness, the measure of proof stated in the first to be required, and to which exception is taken, is said to be " by the weight of the evidence." So it is repeated in the same connection immediately afterwards.

In the fourth assignment, when the court said the weight of the evidence is to appear by testimony in which the jury must have " implicit confidence," the reference was to the credibility of the witness, not to a measure of proof. On December 17, 1879, defendant filed his equitable plea, which permitted proof of counter-claim. No such claim, however, could be set off upon which a right of action accrued more than six years prior to the filing of the plea. This was practically the statement of law complained of in the eighth assignment, and was correct. Whether the statement of fact, wherein the court said, " As I recollect it, there are but two items where the money was paid within six years," was correct or not is not material. If the court was wrong in recollection of testimony this is no error. Mis-statement of fact by the court is not ground for reversal, unless there are binding instructions: Hamet *v.* Dundass et al., 4 Barr, 178; McDowell *v.* Oyer, 9 Harris, 422; Bitner *v.* Bitner, 15 P. F. Sm., 347. The action of the court below in sending-out, or refusing to send out, documents with the jury, is discretionary, and not the subject of error: Spence *v.* Spence, 4 W., 165; Hamilton

v. Glenn, 1 Barr, 340; O'Hara v. Richardson, 10 Wr., 389. A paper will not be allowed to go to the jury containing a statement of items of some of which there is no proof: Morrison v. Moreland, 15 S. & R., 61.

Mr. Justice TRUNKEY delivered the opinion of the court, May 19, 1884.

This action is upon a note dated April 1, 1873, for $1,800. On January 11, 1878, the parties to the note made a contract with Boyer and executed a deed to him, giving Boyer until March 15th, the right to purchase a tract of land, and upon paying the money on or before that date the deed to be delivered to him by Pearson—he refused to pay. In the contract was an agreement between Oyer and Ott that said note should be deposited with Pearson, and upon consummation of the sale of the land the note to be given to Ott for $300, but should Boyer refuse to take the land the note to be returned to Oyer. Wilson testified that there was a great controversy between Oyer and Ott about the note, one contending it was right and the other that it was wrong; that the agreement respecting it was negotiated by himself without the parties coming together, and was afterwards embodied in the contract they made with Boyer.

Bogardus testifies that in the spring of 1873, Oyer came to his house and they conversed about the note, that Oyer said Ott did not owe him anything, that the note was given to get Daniel Ott to go home, and he would give it back to Ott. Philips testifies that a short time after the note was given he was at Oyer's house, that Mrs. Oyer remarked that Ott was mad about the note that was given when Daniel was home, and Oyer replied that he was willing to make the note right, it was not right, it was fixed to satisfy Daniel so there would be no bad feelings. Theodore Ott says that Oyer told him the note was not right, that Ott owed him about $300, but they had a settlement to make. This was a number of years after the note was given. Annie Ott testifies that at her father's house, Oyer told Mrs. Ott she should take up that note, that he did not want to go to the workhouse.

Weidman says that in 1873, Ott told him the note was not right, that he owed $1,400. Pearson heard Ott say he owed something on the note, but has no recollection of the amount.

Without remarking the testimony at length we note its salient points the better to understand the bearing of the instructions which are alleged to be erroneous. Daniel Oyer was a son and Ott a son-in-law of Oyer. Whether Daniel was seriously afflicted at the time the note was given is immaterial; it is enough that his near relatives, the parties to the note,

.were alarmed by his conduct. The parties owned and worked a farm together, there is no evidence of a settlement of their transactions at any time—there is evidence tending to show that the note was given and received for the solace of Daniel, and not as evidence of the actual indebtedness of the maker to the payee. At first it seems the payee admitted it was not right, but they did not settle and ascertain what, if anything, was due from Ott to Oyer, and at last they quarreled.

The uncorroborated testimony of one witness is not sufficient to set aside or alter a written contract. Here there is no question of sufficiency; it is not gainsaid that there is testimony to warrant a finding that the note was given for a special and innocent purpose, and either to be returned to the maker, or the true amount of indebtedness to be fixed by a future settlement. With much that was proper to say of Bogardus and his testimony, the court charged: If the testimony of Bogardus is believed the note was given for a temporary purpose with a view of preventing some apprehended calamity in connection with Daniel Oyer, and was to be returned. "If that fact, standing by itself, was proved to your entire satisfaction, that the note was given under those circumstances, and was to be returned again to William Ott after Daniel Oyer had gone away, then, I say to you that the plaintiff would have no right to use that note as evidence of indebtedness against the defendant." "But the burden is upon the defendant. He must satisfy you by the weight of the evidence and by competent evidence, by testimony in which you have implicit confidence." This was equivalent to an instruction that there must be no doubt resting on the minds of the jury respecting the testimony they were to weigh or consider. True, the jury were told they were to determine the credibility of witnesses, but the fact remained that they were instructed that they must be entirely satisfied by testimony in which their confidence was implicit, that is, without doubt. Instead of the context showing that the testimony of a witness might have some weight, if they did not believe it wholly free of doubt, it intensified the force of the words. The strict measure of confidence was applied directly to Bogardus, if they believed him, the plaintiff could not recover; but if they disbelieved him they would pass to consideration of the testimony of other witnesses—if they rejected his testimony, they would determine from the testimony of the others whom the court named, whether there was a mistake in the amount of the note, and if so, what the sum should have been. In effect the jury were instructed that they must give his testimony implicit confidence, or reject it. The credit of a witness may be so shaken that a jury would not rely upon his testimony alone to establish a fact, and yet

[Ott v. Oyer's Executrix.]

justly consider it with other testimony. The degree of weight to be given the testimony of each witness is for the jury, not the court.

To overthrow a written contract it is necessary that the parol evidence be clear, precise and satisfactory. . It has sometimes been said that the evidence must be clear, precise and entirely satisfactory; or full, satisfactory and indubitable; but the context showed that such expressions did not mean that it is requisite that the evidence should lead to a certain conclusion. If used, it should be manifest that the jury understood them in the sense of the rule: " Where written instruments are sought to be reformed, juries must not hesitate or doubt; they must have clear convictions; they must believe the witnesses and must find the facts in issue definitely and distinctly established." Absolute certainty is out of the question, where facts are to be found from oral testimony and circumstances: Spencer *v.* Colt, 89 Pa. St., 314. The jury determine facts according to the weight of evidence, and not by its sufficiency to produce conviction of the absolute certainty of the conclusion arrived at. If the evidence produces a clear conviction, without hesitancy, of the truth of the precise fact in issue, it is sufficient. The law does not require proof so convincing as to leave no doubt resting on the minds of the jurors; it is enough if there be evidence to satisfy an unprejudiced mind, beyond reasonable doubt: Young *v.* Edwards, 72 Pa. St., 257. The first and fourth assignments must be sustained, whether the instruction as to the high degree of proof or confidence, is applied to the witness or to the testimony.

The portions of the charge constituting the second and third assignments of error were misleading. The circumstances of the agreement for sale of the land to Boyer, and of the stipulation therein relative to the note, have already been noted. Why was the attention of the jury called especially to the fact that at the time of making that contract, Ott did not claim that the note was to be returned to him; but if the sale of the land fell, agreed that the note should be returned to Oyer, with the assertion by the court that it was a significant circumstance bearing on the credibility of the testimony of Bogardus? Oyer and Ott were differing so hotly about the note that their agreement respecting its deposit with Pearson was effected by a go-between. Both wanted to sell the land, and if they could make the proposed sale, one would take and the other give $300 in satisfaction of the note; but if they could not, the note to be returned to Oyer. When the note was returned, the parties stood just as they did before the making of the contract. Nothing in that agreement, or in the negotiations

10 Outerbridge.—2.

through Wilson, ought to prejudice or benefit either party.
There was no reason why Ott should then claim to have the
note returned to him.   The only object of its deposit was its
settlement.   Oyer would not deposit it to be satisfied on pay-
ment of $300, except to get Ott's consent to sell the land.
But in any view, it was not for the court to charge that the
omission of Ott to claim a return of the note was a significant
circumstance against the credibility of the testimony of Bogar-
dus respecting the admissions of Oyer made five years before.
Nor was there anything in the testimony of Philips, or of
Theodore Ott, to discredit Bogardus.   The conversations of
Oyer with these three witnesses were at different times and
places, and his declarations as proved by them are consistent,
though not equally full in each instance.   To each, he said
the note was not right; to two of them, that it was given to
satisfy Daniel; to one, that he would return it; to one, that
he was willing to make it right; and to one, that Ott owed
him about $300.   Surely there is nothing in the testimony of
any of these witnesses affecting the credibility of another.   No
two of them heard the same conversation, and there is no dif-
ference in the sense of contradiction.

Upon one line of defence the court charged, "If then, gen-
tlemen of the jury, you are satisfied from the testimony of
Philips and Theodore Ott, that when this note was given by
William Ott tõ John J. Oyer, they only put down an amount
in round numbers—$1,800—and did so without any balancing
of their accounts, and it was understood between them that
this note was afterwards to be corrected and the amount fixed
at the correct sum, then your inquiry will be what that
amount is, and whatever that corrected amount should be, if
there was any correction to be made, for that amount the
plaintiff would be entitled to a verdict together with interest,
less any legal set-off which the defendant has established that
he is entitled to in this case."   Had this not excluded the
testimony of all but two witnesses, it would be free of error.
Upon this point the jury had a right to consider the testimony
of Bogardus, unless they disbelieved him.   They might have
thought him entitled to some credit.   And there was other
evidence corroborative of these witnesses.   All the evidence
tending to establish the fact in issue was for consideration of
the jury, and in so far as the court excluded it, there was
error.   Of course, if the jury found there was nothing due to
the plaintiff, they would render a verdict for defendant.   The
instruction did not require a verdict for plaintiff, unless a bal-
ance was due.   If the defendant wanted specific instructions
upon any point, he could have asked them.   In his argument
he complains that the court omitted to say that the testimony

[Ott *v.* Oyer's Executrix.]

of Philips, Theodore Ott and others was corroborative of the testimony of Bogardus, but he presented no prayer for such instruction. In absence of request the court will not be reversed for what is left unsaid, if what was said was not misleading.

The learned judge charged that all payments made more than six years prior to the date of filing the plea, if not revived by acknowledgment on the part of Oyer, are barred by the statute of limitations. And added, "According to the testimony as I recollect it, there are but two items where the money was paid within six years, viz., the tax of $16.80, and the Peter Frutchey judgment of $585." This on its face, did not prevent the jury allowing other items of set-off if the evidence warranted. But point was given to the apparently correct language, by disallowing the defendant to send out a statement with the jury containing any items except those two, because all others are barred by the statute of limitations. There was evidence tending to show that other items had been paid within six years. Refusing the statement in the presence of the jury, upon the ground stated in the objection, was an interpretation of the instruction which forbade them to allow any set-off, save the said two items, and for that interpretation the eighth assignment must be sustained.

Allowing or disallowing the sending out with the jury of documents and statements is generally discretionary with the court. If the defendant prepared a proper statement of his claim, it is exceedingly strange that there was denial that it go with the jury. In cases like this the practice is almost, if not altogether, uniform to permit the sending out of statements. It is more difficult to conceive a reason why there was denial that the records of the judgment which had been given in evidence be sent out. There was evidence of payments on the judgments before the date of the note. If the jury found the note was a mere security for the sum actually owing upon a settlement, without a statement and without the record of the judgments, they were poorly equipped for ascertaining the sum. Were the statements which the defendant offered to send out printed, and the specific judgments set out in the offer, the records of which were in evidence, possibly the ruling could be reviewed: Riddlesburg Coal Co. *v.* Rogers, 65 Pa. St., 416. The ninth and tenth assignments are not sustained.

Judgment reversed and venire facias de novo awarded.